ORIGINAL

IN THE SUPREME COURT OF THE STATE OF DELAWARE

"APPENDIX B"

JAMES BROWN AKA
EDWARD X. WILLIAMS
SBI# 350587
APPELLANT, DEFENDANT
Below

NOS. 31, 2003 and
57, 2003 (Consolidated).

v.

STATE OF DELAWARE

05 - 440

ON APPEAL FROM THE SUPERIOR COURT
OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

FILED

JUN 27 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

APPELLANT'S APPENDIX

PETER N. LETANG
DEPUTY ATTORNEY GENERAL
DEPARTMENT OF JUSTICE
CARVEL STATE BUILDING
820 N. FRENCH STREET
WILMINGTON, DE, 19801

Date: 03/20/03

JAMES BROWN AKA
EDWARD X. WILLIAMS SBI# 350587
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK RD. UNIT# 21-D-7-L
SMYRNA, DELAWARE, 19977

TABLE OF CONTENTS

TRIAL RECORD                                                              PAGE

4-1-98  Deft., Counsel, Court discuss Brady Violation        A-1
Pg. 21:23

7-1-98 pg. 3:1:16 Counsel, Court discuss Brady               A-2

4-1-98 pg. 87:12:19 "BOZEMAN-DIRECT"                         A-3

Super. Ct. Crim. Docket pg. 1 lines 2,3                      A-4

Indictment eight counts 4 pg's.                              A-5
  4-1-98 pg. 130:13:23 "DONOVAN-DIRECT"                      A-6

4-1-98 pg. 131:1:2 "DONOVAN-DIRECT"                          A-7

4-1-98 pg. 88:17:23 "BOZEMAN-DIRECT"                         A-8

4-1-98 pg. 89:19:22 "BOZEMAN-DIRECT"                         A-9

4-1-98 pg. 126:10:13 "DONOVAN-DIRECT"                        A-10

Jeffrey Adams Statement pg. 2 A5, pg. 3 A16                  A-11
  4 pg's dated 5/17/97

4-1-98 pg. 101:5:11 "BOZEMAN-DIRECT"                         A-12

4-1-98 pg. 102:1:4 "BOZEMAN-DIRECT"                          A-13

PHYSICAL EVIDENCE REPORT pg. 2                               A-14

4-1-98 pg. 136:1:8 "DONOVAN-REDIRECT"                        A-15

4-1-98 pg. 66:4:11 "Adams-Direct"                           A-16

Super. Ct. Crim Docket pg. 8 lines 72                        A-17

4-1-98 pg. 19:10:22 "S. Fitzgerald-Cross"                    A-18

4-1-98 pg. 125:1:23 "Donovan-Direct"                        A-19

3-31-98 pg. 104:7:11 "Fitzgerald-Direct"                     A-20

TRIAL RECORDS                TABLE OF CONTENTS

| | PAGE |
|---|---|
| 4·1·98 pg.183:1:3 "Donovan·Direct" | A-41 |
| 3·31·98 pg.2:1:22 "THE COURT" | A-42 |
| 4·1·98 pg.68:22:23 "Adams-Direct" | A-43 |
| 4·1·98 pg.69:1:4 "Adams-Direct" | A-44 |
| Witness# 6 "KEVIN BRITT" | A-45 |
| 4·1·98 pg.149:1:23 "BROWN-DIRECT" | A-46 |
| 4·1·98 pg.151:1:23 "BROWN-DIRECT" | A-47 |
| 4·1·98 pg.152·1:23 "BROWN-DIRECT" | A-48 |
| 4·1·98 pg.153:1:23 "BROWN-DIRECT" | A-49 |
| 4·1·98 pg.154:1:23 "BROWN-DIRECT" | A-50 |

(A-1)                                                        2

```
 1                                        April 1, 1998
                                          9:20 o'clock a.m.
 2                                        Courtroom No. 201

 3     PRESENT:

 4     -           As noted.

 5               THE COURT:  I apologize, counsel.  Are

 6     there any matters we need to take up before the jury

 7     comes in?  Yes, sir, Mr. Brown.

 8               MR. BROWN:  Your Honor, I haven't been able

 9     to get a Rule 16 for discovery.  I asked for it for

10     quite some time.  My counsel just advised me that

11     there was no Rule 16 discovery on this case.  He said

12     that the district attorney didn't have one.  I didn't

13     -- and I didn't get one, so I couldn't -- so I didn't

14     have no way to know, a better way to defend myself on

15     the case without the Rule 16.  I just wanted that to

16     be known for the record.

17               MR. FIGLIOLA:  Your Honor, that is not

18     true.  Mr. Brown was given the discovery reply that I

19     was -- that was provided to me by Mr. Pedersen.  What

20     he did not receive and what I told Mr. Brown is that

21     Mr. Pedersen has no obligation to supply Jencks

22     material until the individual testifies.  It is the

23     Jencks material that we were not supplied with.
```

(A-2)                                                          3

```
 1    We're not entitled to receive it ahead of time.  What

 2    we were entitled to receive we did receive, and it

 3    was given to Mr. Brown.  There's probably one

 4    -exception to that, your Honor, that I did not give

 5    Mr. Brown the M.E.'s report, but I did have it.

 6              THE COURT:  Mr. Brown, since you are

 7    represented by counsel, you are not -- you personally

 8    aren't entitled to the Rule 16.  Obviously, Mr.

 9    Figliola can share that information with you, but

10    it's the -- but the information is given to the

11    attorneys, not to the individual clients.  So you

12    have made your record, and if you want to pursue it

13    later, you are allowed to.  But I think we have a

14    sufficiently clear record, and I see no reason to

15    delay the trial.  Thank you, sir.

16              MR. BROWN:  Also, I have been trying to get

17    some clothes to wear to trial, but I haven't had much

18    success with it since I have been incarcerated for a

19    year.

20              THE COURT:  Do you have family that you

21    have been calling?

22              MR. BROWN:  I haven't been able to get in

23    contact with my family, but I did ask at the jail,
```

Bozeman-Direct                          87

1   city back then.

2        Q     Does that include the area around East 23rd

3   Street?

4        A     No, it does not.

5        Q     Did you find yourself in that area in May

6   of 1997?

7        A     Yes.

8        Q     What brought you to that area at that time?

9        A     I was in that area with my partner, Officer

10  Duckett, investigating a crime, taking a report in

11  the unit block of East 24th Street that day.

12       Q     And do you recall approximately what time

13  on May 17th you would have been in that particular

14  area?

15       A     If I could have my report to refer to.  I

16  don't have it with me.

17            MR. PEDERSEN:  Defense counsel has a copy

18  of that report, your Honor, so I would ask that he be

19  permitted to look at it.

20  BY MR. PEDERSEN:

21       Q     Is that it?

22       A     Yes, it is.  According to the report, it

23  was approximately 11:56 a.m.

A - 3

```
                  SUPERIOR COURT CRIMINAL DOCKET          Page    1
                      ( as of  02/04/2003 )
```

State of Delaware v.  JAMES G BROWN                    DOB: 12/01/1959
State's Atty: STUART E SKLUT , Esq.          AKA:
Defense Atty: ANTHONY A FIGLIOLA , Esq.


Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 9705011656 | IN97051620R3 | ASSAULT 1ST | TGLI | 04/02/1998 |
| 002 | 9705011656 | N97051621 | ATT. MURDER I | NOLP | 05/08/1998 |
| 003 | 9705011656 | N97051622 | PDWDCF | NOLP | 05/08/1998 |
| 004 | 9705011656 | N97051623 | PDWDCF | NOLP | 05/08/1998 |
| 005 | 9705011656 | IN97051624R3 | TRF.COC.5-50G | TG | 04/02/1998 |
| 006 | 9705011656 | IN97051625R3 | PWITDW NSI CS | TG | 04/02/1998 |
| 007 | 9705011656 | IN97051626R3 | CCDW | TG | 04/02/1998 |
| 008 | 9705011656 | IN97051627R3 | RESIST ARREST | TG | 04/02/1998 |
| 009 | 9705011656 | IN97060255R3 | ASLT 2ND | TG | 04/02/1998 |
| 010 | 9705011656 | IN97060256R3 | PFDCF | TG | 04/02/1998 |
| 011 | 9705011656 | IN97060257R3 | PFDCF | TG | 04/02/1998 |

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 1 | 05/30/1997 | CASE ACCEPTED IN SUPERIOR COURT. | |

```
           ARREST DATE: 05/17/97
           PRELIMINARY HEARING DATE: 05/29/97
           BAIL:
           HELD ON SECURED BAIL          190000.00 100
           NO CONDITIONS.
2    06/09/1997
           INDICTMENT, TRUE BILL FILED.
3    06/11/1997
           NOTICE ACKNOWLEDGING RECEIPT OF DISCOVERY.
4    06/25/1997
           SUMMONS MAILED.
     07/07/1997                              ALFORD HAILE L.
           CASE REVIEW CALENDAR CONTINUED
           081197
5    07/25/1997
           ORDER: APPOINTMENT OF COUNSEL; ANTHONY A. FIGLIOLA JR., ESQ. APPOINTED
           TO REPRESENT DEFENDANT.
6    07/30/1997
           SUMMONS MAILED.
7    07/31/1997
           ACKNOWLEDGEMENT SIGNED BY COUNSEL.
```

A-4

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | I.D.#9705011656 |
| JAMES BROWN | ) | |

The Grand Jury of New Castle County charges JAMES BROWN with the following offenses;

### COUNT I. A FELONY

#N_____

ATTEMPTED MURDER FIRST DEGREE in violation of Title 11, Section 531 of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle, State of Delaware, did intentionally attempt to cause the death of Saladin Fitzgerald by shooting said person in the face, which acts, under the circumstances as he believed them to be was a substantial step in course of conduct planned to culminate in the commission of Murder in the First Degree in violation of Title 11, Section 636 of the Delaware Code.

### COUNT II. A FELONY

#N_____

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY, in violation of Title 11, Section 1447A of the Delaware Code of 1974 as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle,

(A-5)

State of Delaware, did possess a gun, a firearm during the commission of Attempted Murder First Degree as set forth in I of this Indictment which is herein incorporated by reference.

## COUNT III. A FELONY

#N_____

ASSAULT SECOND DEGREE in violation of Title 11, Section 612(5), of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle, State of Delaware, did intentionally cause physical injury to Yusef Fitzgerald by means of a deadly weapon by shooting a gun at said person.

## COUNT IV. A FELONY

#N_____

POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY, in violation of Title 11, Section 1447A of the Delaware Code of 1974 as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle, State of Delaware, did possess a gun, a firearm during the commission of Assault Second Degree as set forth in III of this Indictment which is herein incorporated by reference.

## COUNT V. A FELONY

#N_____

TRAFFICKING IN COCAINE in violation of Title 16, Section 4753A(a)(2)(a) of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997 in the County of New Castle, State of Delaware, did knowingly possess more than 5 grams but less than 50 grams of a mixture containing Cocaine, as classified under 16 Del. C. Section 4716(b)(4).

Donovan-Direct                                    130

1    already in custody?

2          A     Yes, he was.

3          Q     And at that time what was he in custody

4    for?

5          A     He was in custody because patrol officers

6    apprehended him at the scene, and when they searched

7    him, he had a weapon on him.  He also had a large

8    quantity of crack cocaine.

9          Q     As a result of your investigation and your

10   interviews, did you make a determination about

11   formally placing the defendant under arrest?

12         A     That's correct.

13         Q     And are you the person who in fact placed

14   him under arrest?

15         A     No.  This was all added on to the one

16   incident, arrest report, which was -- Officer Duckett

17   made out the arrest report.

18         Q     When you decide to formally arrest someone,

19   sir, do you normally prepare what is referred to as

20   arrest warrants?

21         A     That's correct.

22         Q     Did you prepare those?

23         A     No, I did not.

A - 6

Donovan-Direct                                    131

1        Q      Who prepared those?

2        A      Officer Duckett did.

3        Q      And did you confer with him?

4        A      Yes, I did.  I told him.

5        Q      And assisted him in the preparation of

6    those?

7        A      That's correct.

8        Q      The map that we have been referring to

9    sometimes over there, Detective, can you tell us who

10   the artist -- artiste was on that?

11       A      I was.

12       Q      The area that's depicted in that location,

13   is that in the City of Wilmington?

14       A      Yes, it is.

15       Q      State of Delaware?

16       A      Yes, it is.

17              MR. PEDERSEN:  I have no further questions,

18   your Honor.

19                   CROSS EXAMINATION

20   BY MR. FIGLIOLA:

21       Q      Good afternoon, Officer.

22       A      Good afternoon.

23       Q      Officer -- or Detective, when you

A - 7

## COUNT VI. A FELONY

#N_____

POSSESSION WITH INTENT TO DELIVER A NARCOTIC SCHEDULE II CONTROLLED SUBSTANCE in violation of Title 16, Section 4751 of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997 in the County of New Castle, State of Delaware, did knowingly and unlawfully possess Cocaine, a Narcotic Schedule II Controlled Substance as classified under 16 Del. C. Section 4716(b)(4), with the intent to deliver same.

## COUNT VII. A FELONY

#N_____

CARRYING A CONCEALED DEADLY WEAPON in violation of Title 11 Section 1442 of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle, State of Delaware, did knowingly and unlawfully carry concealed upon his person a gun, a deadly weapon as defined under 11 Del. C. Section 222(6).

## COUNT VIII. A MISDEMEANOR

#N_____

RESISTING ARREST in violation of Title 11, Section 1257 of the Delaware Code of 1974, as amended.

JAMES BROWN, on or about the 17th day of May, 1997, in the County of New Castle, State of Delaware, did intentionally attempt to prevent Officer Duckett of the Wilmington Police

Department, from effecting an arrest of himself by refusing to get down on the ground and struggling with said officer.

A TRUE BILL

_____
(FOREPERSON)

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

Bozeman-Direct                                    88

1      Q    And at that time while you were in that

2    particular area, did you hear or see something that

3    caused you as a police officer to be concerned?

4      A    We heard what sounded like two gunshots

5    coming from somewhat of the south of us.  We couldn't

6    tell particularly where it was coming from.

7      Q    What did you do when you heard what sounded

8    like gunshots?

9      A    We left the area we were in in our patrol

10   vehicle and drove around the block to the area of the

11   unit block of East 23rd Street.

12     Q    And what did you encounter over there?

13     A    During the time we were responding to that

14   area, the dispatch center advised us that they were

15   getting reports of shots fired and they gave us a

16   suspect description.

17     Q    You were referring to we.  Did you have a

18   partner at that time?

19     A    My partner, Officer Michael Duckett.

20     Q    Is he still presently your partner?

21     A    No, he's not.

22     Q    Is he presently on injured relief duty?

23     A    He's off sick from work.

A - 8.

1      Q    But at that time you were working with

2   Officer Duckett?

3      A    Yes.

4      Q    While you were traveling from the unit

5   block of East 24th Street to 23rd, you said you heard

6   a report over the 911 center of shots fired?

7      A    Yes, we did.

8      Q    What did you encounter when you got to that

9   area?

10     A    When we got to the area of 23rd and Lamotte

11  Street, there were several people on the corner who

12  were pointing eastbound in the direction of Carter

13  Street, 23rd and Carter.  They stated that the

14  shooter was in that direction.

15     Q    Did you respond in that direction?

16     A    Yes, we did.

17     Q    What happened when you went towards where

18  the people were pointing?

19     A    During the time we were responding, we

20  received a description from the radio room.  It was a

21  vague description.  It was a black male wearing a

22  gray jacket, no further details.  When we got to the

23  area of 23rd and Carter, we encountered a group of

A - 9

Donovan-Direct                                    126

1    Exhibit No. 5.)

2    BY MR. PEDERSEN:

3        Q    Detective, can you tell me, on the back of

4    those photographs, do you have some biographical

5    information?

6        A    That's correct.

7        Q    Do you know -- did you know at that time

8    the name of the person, Mr. Saladine Fitzgerald,

9    identified as number two?

10       A    Yes, I did.  I took this Polaroid picture

11   of him.

12       Q    And who was that?

13       A    That was James Brown.

14       Q    Is that the same -- well, did you talk to

15   Yusuf Fitzgerald?

16       A    Yes, I did.

17       Q    After showing Saladine Fitzgerald that

18   array, was that pretty much the sum and substance --

19       A    Yes, I didn't speak with him much.  He was

20   under -- seeking treatment and was not really able to

21   speak.

22       Q    Did you speak to Yusuf Fitzgerald?

23       A    Yes, I did.

A - 10

WILMINGTON DEPARTMENT OF POLICE

WILMINGTON, DELAWARE

DATE:   17 MAY 1997                          CASE NO.  97-12047

TIME:   1325 HOURS

LOCATION:  DETECTIVE DIVISION CONFERENCE ROOM

PRESENT:   DETECTIVE ROBERT DONOVAN AND JEFFREY ADAMS

RD    In front of me I have a Witness Statement form that I'm going to read. It says I, Jeff
      Adams, make this statement appearing below, I make it of my own free will without fear,
      threat, or promise of any kind or for anything of value. This statement is made to
      Detective Robert Donovan who has identified himself to me as a member of the
      Wilmington Department of Police. He has advised me that they are investigating a
      complaint of a Shooting, supposedly occurring on this date, 17 May 1997, at or near 23rd
      and Lamotte Street.

Q1    Do you understand the above paragraph which I have just read to you?

A1    Yes.

Q2    What is your full name, age and address?

A2    Jeffrey M. Adams, 609 Scott Street, 37 years.

Q3    Okay, can you read and write?

A3    Yeah.

Q4    And what is the highest grade you've completed in school?

A4    10th.


I, Jeffrey Adams, have had read to me the above paragraph and understand it fully.

RD    Just sign your name there. Let the record reflect that Jeffrey Adams is signing the
      Witness form.

A-11

STATEMENT/JEFFREY ADAMS
WPD CASE NO. 97-12047
PAGE 2


RD      Ah again, this is relative to case number 97-12047, which is a Shooting that occurred in
        the area of 23rd and Lamotte Street on this date at approximately 1156 hours.  If you
        could tell me just basically what you saw and heard?

A5      What I saw was a argument started between Biggy and the other guy and Gray Jacket
        who did the shootin'.  I went...I come out...I come outside, they was arguing, and that was
        it, then I went back in the house, then when I heard two gunshots, that's when I came
        back outside and that's when the guy started shootin' the gun in the air and that's when
        he ran. (I didn't see when he shot Biggy, but I seen when he did all the other and all that.)
        And that's when I went around the corner and tried to catch him and that's when the
        Wilmington Police showed up, and I helped them you know handcuff him and tried to
        keep the crowd off of him.

Q6      Okay so you were outside and you seen a guy that you didn't recognize wearing a gray
        jacket?

A6      Right and that's when he did the one that did the shootin'.  I do...I seen the gun in his
        hand.

Q7      I mean the first time you saw him...

A7      The first time, he had the gun in his hand, he was wavin' it and he stuck it back in his
        right, his left-side pocket in his gray jacket.

Q8      Okay and he was just arguing...

A8      Then he ran up the street, then him and Biggy got into an argument.  Biggy come out and
        got in the middle of the street.  I said fuck it, this was an argument.  I went back in the
        house, then I heard two gunshots that's when I came out, then there was one guy was
        laying in the middle of the street, we thought he shot in forehead.  He grabbed them, they
        both ran together.

Q9      Who grabbed him?

A9      The guy who did the shooting.  He grabbed them, they ran in like 23rd Street into the
        fifth house, white porch house, ran in the alleyway, that's when I come around the corner.
        Before I got around the corner too, that's when the...two Wilmington Police officers
        showed up.

Q10     Okay and you helped the Wilmington Police?

STATEMENT/JEFFREY ADAMS
WPD CASE NO. 97-12047
PAGE 3


A10    Yes, handcuff him and put him down.

Q11    Okay so when...after you heard the two gunshots and you came back out the house, you observed this guy...

A11    When he start shooting again, when he emptied his gun, that's when he ran.

Q12    You seen him with a gun in his hand?

A12    Right, it looked like a .32 or .22 revolver.

Q13    Something small?

A13    Yes, looked like a revolver.

Q14    Revolver?  Okay, this guy that was doing the shooting, do you know him?  Have you seen him before?

A14    I might seen him a couple times, I don't even know who he is.

Q15    Okay...

A15    He's somebody new to me in the area.

Q16    Okay, okay.  And you said there was at least two people shot, maybe a third person?

A16    Right, the third person...I was two...the other person who I stopped the Pol...stopped him for jumpin' on the guy when the Police had him, we never knew he was shot!  'Til he said he was shot in the arm.  The person who we was worryin' about was the one we thought got shot in the head, who or whoever the guy who did the shooting, we thought he hit him in the head, but he just brazed him.  We thought he was shot in the head, then we...then everybody said he shot Biggy in the eye.  He took the gun and shot him.  I didn't see the part when he shot Biggy but everything else, that's when I seen him when he emptied the gun and that's when he start running.

Q17    Okay so who were the guys that were shot?  Biggy was shot...

A17    Biggy, his brother.

Q18    His brother?

STATEMENT/JEFFREY ADAMS
WPD CASE NO. 97-12047
PAGE 4

A18    And the guy was layin' on the ground, I don't know his name, that's the one they thought he shot in the head.

Q19    Was brazed?

A19    Right, he was brazed with the gun.

Q20    I want to grab a picture and just get you to look at it real quick while I have this tape ah running.

A20    Right.

[PAUSE]

Q21    What I'd like to do Jeff is show you this picture here.

A21    Yeah, that's him.

Q22    Is that the gentleman...

A22    Who did the shootin', yes.

Q23    That you helped the Police take into custody?

A23    Yes.

Q24    Okay...

A24    I have seen him before. There's a picture out on him. He's wanted, I have seen him.

Q25    Is there anything else relative to this shooting that you'd like to say or anything else that you could think of?

A25    Unh um (no).

RD    Okay, alright, the time is 1332 hours, and this will conclude the interview.

/pap

Bozeman-Direct                    101

1      A    The tag shows a place of occurrence of 23rd

2   and Lamotte and the person arrested is James G.

3   Brown.  They were found on the person of the person

4   listed.

5      Q    I believe you said you found the gun in the

6   left pocket of the jacket?

7      A    Yes.

8      Q    Where did you discover the Rite Aid bag?

9      A    In the right pocket of the jacket.

10     Q    Right pocket of the jacket?

11     A    The same jacket, yes.

12     Q    And when you said that when you and Officer

13  Duckett first encountered the subject he had his

14  hands in his pockets, are those the pockets we're

15  talking about?

16     A    Yes, they were.

17     Q    Officer, I believe you said earlier -- you

18  referred to the fact that you wrote a report or your

19  partner wrote a report?

20     A    Yes.

21     Q    Do you recall in that report that you or

22  your partner may have stated that there were three

23  empty casings found with the gun?

A - 12

Bozeman-Direct                                    102

1      A      The report does state that there were three

2   empty casings and two live rounds.  But upon

3   unloading the gun, as I stated, I found two of each,

4   -two live and two spent.

5      Q      Officer, do you recognize the person that

6   you and your partner wrestled to the ground with the

7   assistance of Mr. Adams on that day?

8      A      Yes, I do.

9      Q      Could you point him out for us, please?

10      A      Seated at the defense table in the

11   Department of Corrections uniform.

12          MR. PEDERSEN:  Just a moment, your Honor.

13   Nothing further, your Honor.

14                  CROSS EXAMINATION

15   BY MR. FIGLIOLA:

16      Q      Good morning, Officer.

17      A      Good morning.

18      Q      Officer, I guess if my math is right, at

19   the time of this incident you were pretty new to the

20   force.  Is that correct?

21      A      Yes, I was.

22      Q      Now, you said you heard shots.  Do you

23   remember how many shots you heard?

A-13

PAGE #2 OF 9
30-97-12047
DET. ROBERT DONOVAN I-6278

## CASE SUMMARY; CONTINUED

WHILE SPEAKING WITH THE WITNESSES AND VICTIM #2 YUSUF FITZGERALD, IT WAS LEARNED THAT THE SUSPECT (JAMES BROWN) WAS HAVING AN ARGUMENT WITH VICTIM #1 (SALADIN FITZGERALD) OVER DRUGS. THE SUSPECT WALKED AWAY FROM THE AREA AND RETURNED WITH A GUN IN HIS HAND. THE SUSPECT WALKED UP TO VICTIM #1 (SALADIN FITZGERALD) AND SHOT HIM ONE TIME IN THE LEFT EYE. AT THIS TIME VICTIM #2 (YUSUF FITZGERALD) WHO WAS STANDING WITH VICTIM #1, ATTEMPTED TO RUN FROM THE AREA AT WHICH TIME THE SUSPECT FIRED TWO ROUNDS AT HIM STRIKING HIM IN THE RIGHT ARM AS HE ENTERED AN ALLEYWAY.

THE SUSPECT BROWN WAS POSITIVELY IDENTIFIED BY BOTH VICTIM'S AND ALL OF THE WITNESSES THROUGH A PHOTOGRAPHIC LINEUP. THE SUSPECT JAMES BROWN WAS THEN ARRESTED AND BOOKED FOR TWO COUNTS ATTEMPTED MURDER 1ST, TWO COUNTS POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY, ONE COUNT CARRYING A CONCEALED DEADLY WEAPON, ONE COUNT TRAFFICKING COCAINE, ONE COUNT POSSESSION WITH INTENT TO DELIVER COCAINE, AND ONE COUNT OF RESISTING ARREST.

## CRIME SCENE:

THE CRIME SCENE WAS LOCATED IN THE UNIT BLOCK E 23RD STREET APPROXIMATELY ONE HUNDRED FEET WEST OF LAMOTTE STREET. THE SUSPECT WAS LOCATED AND TAKEN INTO CUSTODY IN THE 2300 BLOCK CARTER STREET ON THE WEST SIDE OF THE STREET IN A AN ALLEYWAY.

## PROPERTY STOLEN: NONE

## PHYSICAL EVIDENCE:

EVIDENCE DETECTION UNIT OFFICER FILLIPONE RESPONDED TO THE CRIME SCENE AND TOOK PHOTOGRAPHS. OFFICER DUCKETT RECOVERED A .22 CALIBER F.I.E. BRAND REVOLVER MODEL T-18, SERIAL NUMBER 02888 WHICH CONTAINED THREE SPENT CASINGS AND TWO LIVE ROUNDS, FROM THE LEFT FRONT JACKET POCKET OF THE SUSPECT JAMES BROWN.

OFFICER DUCKETT ALSO RECOVERED ONE PLASTIC BAG WHICH CONTAINED NUMEROUS SMALL PLASTIC BAGS WHICH CONTAINED A WHITE/ TAN CHUNKY SUBSTANCE FROM THE SUSPECT JAMES BROWNS RIGHT FRONT JACKET POCKET, ALONG WITH $307.00 UNITED STATES CURRENCY WHICH WAS RECOVERED FROM THE LINING OF THE SUSPECTS JACKET.

A· 14

1    Officer Bozeman testified they retrieved the gun and

2    the drugs?

3         A    Yes, I did.

4         Q    And did you see the color of that jacket?

5         A    Yes, it was like a gray.

6         Q    Did that match the description given to you

7    by some of the witnesses?

8         A    That's correct.

9              MR. PEDERSEN:   Nothing further, your Honor.

10                  RECROSS EXAMINATION

11   BY MR. FIGLIOLA:

12        Q    Detective Donovan, Mr. Pedersen just asked

13   you if the gray jacket matched the description of the

14   jacket given to you of the person that did the

15   shooting.  Is that correct?

16        A    That's correct.

17        Q    Did you ever receive information that the

18   person that did the shooting was wearing a yellow

19   jacket?

20        A    Not that I recall.

21        Q    What was -- did you ever interview Mr.

22   Brown?

23        A    I spoke with him.  I asked him if he wanted

A·15

Adams-Direct                                          66

1        Q    So opposite side of the street, about 10

2   houses down?

3        A    Ten houses up.

4        Q    And you said you heard some arguing.  Did

5   you ever see any fisticuffs, any punches thrown or

6   anything like that?

7        A    No.  He was in his face like this, like a

8   fair fight, let's get it on, and that was it.  They

9   was like, you know, supposed to have been a fair

10  fight.  Then the gentleman just pulled out something

11  and shot him.

12       Q    Did there -- when you first noticed the

13  arguing --

14       A    The first when I noticed the arguing, he

15  was in the middle of the street.

16       Q    Who was in the --

17       A    And the other gentleman that got shot was

18  in the middle of the street.  The other gentleman

19  left, ran to the front porch, and then he came back

20  and he said, let's get it on.  It was a fair fight.

21  We thought it was over with.

22       Q    About how far away were the two gentlemen

23  standing when you heard, let's have a fair fight?

A - 16

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    8
                        ( as of  10/28/2002 )

State of Delaware v.  JAMES G BROWN                     DOB: 12/01/1959
State's Atty: STUART E SKLUT , Esq.          AKA:
Defense Atty: ANTHONY A FIGLIOLA , Esq.

        Event
No.     Date           Event                            Judge
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
        NER YOU MAY RECEIVE THIS COURT'S DECISION.
        THE COURT WILL AWAIT YUR RESPONSE BEFORE CONSIDERING THE MOTION.
70      01/14/2002
        DEFENDANT'S RESPONSE FILED. RULE 61.
71      04/01/2002
        MOTION FOR POSTCONVICTION RELIEF (PRO SE) FILED.
        REFERRED TO JUDGE CARPENTER-DEFENDANT HAS PENDING RULE 61.
72      06/24/2002
        LETTER REQUESTING DEFENSE/STATE'S ATTORNEY TO WITHDRAW EXHIBITS.
        07/08/2002
        NOTICE - OKAY TO DESTROY PER PETER LETANG
73      08/01/2002                              CARPENTER WILLIAM C. JR.
        ORDER: ON DEFENDANT'S PRO SE MOTION FOR POSTCONVICTION RELIEF: DENIED.
        * SEE FULL ORDER IN FILE

                *** END OF DOCKET LISTING AS OF  10/28/2002 ***
                     PRINTED BY: CSCAHAI
```

A-17

S. Fitzgerald-Cross                          19

1   whole time?

2       A    No, Christiana.

3       Q    Christiana.  When was the first time the

4   police showed you the photo IDs?

5       A    Right there at the hospital, when I went in

6   -- as soon as I got to Christiana, when I left the

7   Wilmington Hospital.

8       Q    Do you remember how many pictures they

9   showed you?

10      A    It was a whole sheet with pictures all from

11  the top to the bottom.

12          MR. FIGLIOLA:  Your Honor, there's no

13  objection.  I would like to have this marked into

14  evidence at this time, rather than identification.

15          THE COURT:  At least show it to him to make

16  sure it's the same photographs he's been shown.

17  Let's mark it as A first and we'll see if it's the

18  same.

19          THE PROTHONOTARY:  It will be marked as

20  Defense Identification A.

21          (A photo array was marked as Defendant's

22  for Identification A.)

23  BY MR. FIGLIOLA:                A - 18

Donovan-Direct                              125

1    BY MR. PEDERSEN:

2        Q    I am going to show you what's been marked

3    as Identification Number A.  Do you recognize that?

4        A    Yes, I do.

5        Q    Is that the lineup you showed Saladine

6    Fitzgerald?

7        A    That's correct.

8        Q    Is that the same form or manner it was

9    shown to him?

10.      A    That's correct.

11       Q    And has it been altered in any way between

12   then and today?

13       A    No.

14            MR. PEDERSEN:  Your Honor, I would offer

15   that as the next State's exhibit.

16            MR. FIGLIOLA:  No objection.

17            THE COURT:  Admitted.

18            MR. PEDERSEN:  It's been marked for

19   identification, not in evidence.

20            (Discussion off the record.)

21            THE PROTHONOTARY:  It will be marked as

22   State's Exhibit Number 5.

23            (Photographic lineup is marked as State's

A - 19

3-31-98

1      Q      Is your eye bothering you?

2      A      Uh-huh.

3      Q      Do you need to take a moment?

4      A      Uh-huh.

5      Q      Just if you could speak into the

6   microphone.  Do you recognize this?

7      A      Uh-huh.

8      Q      And why do you say you recognize that?

9      A      Because that is what kind of -- I can't say

10   that that is actually the gun, but it was similar to

11   that one.

12           MR. PEDERSEN:  May I have just a moment,

13   your Honor?

14           THE COURT:  Sure.

15           MR. PEDERSEN:  Your Honor, I have no

16   further questions.

17           MR. FIGLIOLA:  May we approach, your Honor?

18           THE COURT:  Sure.  Why don't we take a

19   short break.  Why don't you take the jury out.

20           (The jury leaves the courtroom.)

21           MR. FIGLIOLA:  Your Honor, I was under the

22   belief that we were going to adjourn at three

23   o'clock, so I was going to just indicate that I

A - 207

Y. Fitzgerald-Redirect                    47

1   and you went to your brother, did you see an

2   individual in the street with the gun pointed out

3   like this?

4          THE WITNESS:  Not at that time.

5          THE COURT:  Not at that time?

6          THE WITNESS:  I was looking for my brother.

7          THE COURT:  So the first time you really

8   saw the gun or heard a gun was when the struggle was

9   going on and you heard the shot?

10         THE WITNESS:  Yeah.  He was still walking

11  backwards with the gun.

12         THE COURT:  So after the shot, that's when

13  you saw that, right?

14         THE WITNESS:  (Witness nods head.)

15         THE COURT:  But before the shot, you saw no

16  gun that you can recall?

17         THE WITNESS:  No, I didn't see no gun.

18         THE COURT:  Thank you.

19         MR. FIGLIOLA:  Nothing further, your Honor.

20         THE COURT:  Thank you, sir.  You may step

21  down.  Your next witness.

22         MR. PEDERSEN:  Maryellen Bogert.

23         MARYELLEN BOGERT, called on the part and

A - 21

1    there has been no testimony that, in fact, had he not

2    been treated, that he could have died from these

3    injuries.  Therefore, I don't believe the State has

4    proven that the injuries suffered by Saladine were in

5    fact death threatening.

6            THE COURT:  Do you think that's necessary?

7    I guess that's my only question.  A substantial step

8    in attempting to kill another individual.

9            MR. FIGLIOLA:  Your Honor, there has been

10   no -- under normal circumstances, I would say no.

11   However, there has also been no testimony that there

12   was a threat to kill anyone, and I think that's

13   important because it is an intentional act, and

14   there's got to be something to support what was to

15   come of that intentional act.  It can't be supported

16   by any testimony that the injuries themselves could

17   have caused death, and there has been no testimony

18   that there was ever a threat of death made to

19   Saladine Fitzgerald.

20           THE COURT:  Okay.

21           MR. FIGLIOLA:  Your Honor, the other count

22   would be Count Number Six, possession with intent to

23   deliver a narcotic Schedule Two controlled substance.

```
 1              Your Honor, the evidence before the Court

 2     is that Mr. Brown was found with drugs in his

 3     possession, and that those drugs weighed 14 some

 4     ounces -- I mean grams, your Honor.  That's

 5     sufficient evidence for a conviction of trafficking

 6     and possibly simple possession.  There has, however,

 7     not been any testimony whatsoever of any action on

 8     the part of Mr. Brown to transfer that substance to

 9     anyone.  There's been no testimony indicating that

10     the way the drugs were packaged, the money on Mr.

11     Brown, or any other evidence of that sort which would

12     normally be introduced in a possession with intent to

13     deliver case is not evident in this trial and is not

14     before this Court.  The only evidence before the

15     Court is that he was in possession of the drugs and

16     the weight of the drugs, and your Honor, we would

17     submit that's a trafficking situation and not a

18     possession with intent to deliver, and you need more

19     than that to substantiate Count Six.  And we would

20     ask that that also be dismissed.

21              THE COURT:  Thank you.

22              MR. PEDERSEN:  Your Honor, as to the

23     question that you asked of Mr. Figliola, that was the
```

A- 23

| 4 DEPARTMENT | | SUPPLEMENT REPORT | 6 COMPLAINT NO. |
|---|---|---|---|
| Wilmington Police Dept | | | 97-12047 |

| 1 PAGE | | 3 DATE-TIME THIS REPORT | 1. V ☐ D ☒ | 7 NAME (LAST - FIRST - MIDDLE) (BUSINESS/FIRM NAME) |
|---|---|---|---|---|
| 1 | of 4 | 5-17-97 1900 | S ☐ RP ☐ | Brown, James Guy |

| 23 DATE - TIME OF ORIGINAL INCIDENT | | 12 ADDRESS | 84 ARREST NO. |
|---|---|---|---|
| 17 May 1997 | 1156 | 2402 Jessup St Wilm DE | 97-3680 |

| 29 4-F-14 SENT    DATE | SUP SENT | 47 ADDITIONAL STOLEN | 59 OFFENSE CHANGED FROM | 27 SUPPLEMENT CODE |
|---|---|---|---|---|
| YES ☐   NO ☐ | YES ☐  NO ☐ | N | A | |

| 58 FOLLOW-UP ☐ ADD INFO ☒ | 44 RECOV. STOLEN DATE | 46 ADDITIONAL RECOVERED | 25 CORRECT OFFENSE | 26 U.C.R. CLASS |
|---|---|---|---|---|
| | N | N    A | Attempt to Commit | A |

NARRATIVE CODE: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION. REPORT ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT. DESCRIBE AND RECORD THE VALUE OF RECOVERED PROPERTY. LIST THE NAME, RECORD NUMBER AND DESCRIPTION OF PERSONS ARRESTED. EXPLAIN CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY.

25-1 A CRIME TO WIT MURDER 1ST "/0531 0001 F/A

25-2 ATTEMPT TO COMMIT A CRIME TO WIT MURDER 1ST "/0531 0001 F/A

25-3 POSSESSION OF A DEADLY WEAPON DURING COMMISSION OF FELONY "/1447 0000 E/B

25-4 POSSESSION OF A DEADLY WEAPON DURING COMMISSION OF A FELONY "/1447 0000 F/B

25-5 TRAFFICKING COCAINE 16/4753 AA2A F/B

25-6 POSSESSION WITH INTENT TO DELIVER COCAINE 16/4751 0000A F/C

25-7 CARRYING A CONCEALED DEADLY WEAPON "/1442 0000 F/C

25-8 RESISTING ARREST "/1257 0000 M/A

9

10    11E (DUCKETT/BOZEMAN) WERE IN THE UNIT BLOCK OF E.

11 24TH ST COMPLETING A REPORT WHEN THESE OFFICERS HEARD

12 TWO GUNSHOTS FROM THE AREA OF 23RD & LAMOTTE ST. THESE

13 OFFICERS BEGAN TO MOVE INTO THE AREA AT WHICH TIME

14 WILCOM ADVISED THEY HAD RECEIVED A CALL ABOUT A MAN

15 WITH A GUN AT 23RD & MARKET ST. WILCOM ADVISED THESE

16 OFFICERS THAT THEY SUBJECT WAS A BLACK MALE WEARING A

17 GREY JACKET, N.F.D. THIS OFFICER RESPONDED TO 23RD & LAMOTTE

ST AT WHICH TIME SEVERAL SUBJECTS ON THE CORNER STATED

THE SUSPECT WAS IN THE AREA OF 23RD & CARTER ST. THIS

OFFICER OBSERVED A CROWD OF APPROXIMATELY 40 PEOPLE AT

23RD & CARTER ST AND ADVISED WILCOM OF SAME. THIS

| 52 REPORTING OFFICER | NO. | DIV. | 53 STATUS | 54 EXCEPTIONAL CLEAR | |
|---|---|---|---|---|---|
| Michael J. Dufort | E/6986 | PAT | ☐ UNFOUNDED      ☐ ARREST - JUV. | ☐ DEATH SUSPECT | ☐ NO V COOPERATION |
| 51 SUPERVISOR APPROVING | | | ☐ PENDING - ACTIVE   ☐ PEND-INACTIVE | ☐ PROSECUTION DECLINED | ☐ JUV NO CUSTODY |
| A. Steve Yermosa 6/5/1 | | | ☒ ARREST - ADULT    ☐ SERVICE CLEAR | ☐ EXTRADITION DECLINED | ☐ ADMIN SANCTION |

| 54 SOLVABILITY FACTORS | ☐ WIT | ☐ MO. | ☐ EVIDENCE | ☐ TRAC. STOLEN | ☐ SUSP VEH ID'ED | 57 | |
|---|---|---|---|---|---|---|---|
| ☐ SUSP. NAMED | | ☐ SUSP LOCATED | | ☐ SUSP DESCRIBED | ☐ SUSP ID'ED | OFFICE  FOLLOW-UP  CLOSE | |

DOC #45-06-78/06/08 DSP-6016 (8/89)

DEPARTMENT WILMINGTON PD

**CONTINUATION SHEET**

| 5 PAGE | 6 COMPLAINT NO. | 52 INVESTIGATING OFFICER |
|---|---|---|
| 2 OF 4 | 30-97-12047 | DUCKETT / BOZEMAN |

OFFICERS ALSO ADVISED WILCOM TO SEND ASSISTING UNITS INTO THE AREA.

THIS OFFICERS RESPONDED TO THE 2300 BLOCK OF CARTER ST AND SEVERAL PEOPLE ON THE CORNER STATED "THERE HE IS." AND "THERE HE GOES." THE SUBJECTS ON THE CORNER THEN POINTED TO A BLACK MALE WEARING A GREY JACKET AND BLUE SWEATPANTS WALKING WESTBOUND INTO AN ALLEYWAY IN THE 2300 BLOCK OF CARTER ST. THIS OFFICER EXITED THE MARKED PATROL VEHICLE AND ATTEMPTED TO CONDUCT A FELONY PEDESTRIAN STOP ON THE SUBJECT. THIS OFFICER DREW MY DEPARTMENTAL ISSUED HANDGUN AND ORDERED THE SUBJECT TO LAY ON THE GROUND. THE SUBJECT REFUSED TO COMPLY AND CONTINUED TO STAND IN THE ALLEY WITH HIS HANDS IN THE JACKET POCKETS.

THESE OFFICERS GRABBED THE SUBJECTS ARMS AND ATTEMPTED TO FORCE HIM TO THE GROUND AT WHICH TIME THE SUBJECT BEGAN TO STRUGGLE WITH THESE OFFICERS, AT THIS TIME W-1 ( JEFF ADAMS) APPROACHED THESE OFFICERS AND ASSISTED IN PLACING THE SUBJECT ONTO THE GROUND AND TAKING SAME INTO CUSTODY. THESE OFFICERS THEN SEARCHED THE DEF ( JAMES G. BROWN) AND A BLACK 22 CALIBER REVOLVER WAS LOCATED IN THE FRONT LEFT POCKET OF THE DEF'S JACKET. THE REVOLVER CONTAINED TWO UNSPENT CASINGS AND THREE SPENT CASINGS IN SAME. THESE OFFICERS ALSO LOCATED A PLASTIC BAG CONTAINING A PLASTIC RITE AID BAG, WHICH CONTAINED A CLEAR PLASTIC BAG. SAME BAG

CRIMINAL INVESTIGATION

DEPARTMENT WILMINGTON PD

**CONTINUATION SHEET**

| 5 PAGE | | | 6 COMPLAINT NO. | 52 INVESTIGATING OFFICER |
|---|---|---|---|---|
| 3 | of | 4 | 30-97-12017 | DUCKETT /BOZEMAN |

DID CONTAIN ONE PLASTIC BAG CONTAINING NUMEROUS TAN CHUNKY ROCKS, ONE PLASTIC BAG CONTAINING NUMEROUS TAN CHUNKY ROCKS, AND THIRTY NINE (39) PLASTIC BAGS EACH CONTAINING A TAN CHUNKY ROCK, ALL SUSPECTED TO BE CRACK COCAINE.

OFF. BOZEMAN LOCATED $307.00 USC INSIDE THE LEFT SIDE LINER OF THE DEF'S (JAMES G. BROWN) JACKET, THE MONEY WAS IN VARIOUS BUNDLES IN DENOMINATIONS OF FIFTIES (1), TWENTIES (5), TENS (5), FIVES (9), AND ONES (61). THIS OFFICER CONDUCTED A FIELD TEST ON THE SUSPECTED TITLE 16 EVIDENCE AND SAME RECEIVED A POSITIVE REACTION AS CRACK COCAINE. THE 22 CALIBER REVOLVER, CASING, BULLETS, USC, AND TITLE 16 WERE TAGGED INTO EVIDENCE AND PLACED INTO THE TEMPORARY EVIDENCE LOCKER, WITNESSED BY LT. DONAHUE

EDU WAS CONTACTED AND ADVISED OF THE INCIDENT. SEE EDU SUPPLEMENT REPORT FOR ADDITIONAL DETAILS. THIS OFFICER HAD DETECTIVES ADVISED OF THE INCIDENT AND DET. DONAVAN RESPONDED TO ASSIST IN THE INVESTIGATION. DET. DONAVAN CONDUCTED A PHOTOGRAPHIC LINEUP WITH THE WITNESS AND ALL WITNESSES IDENTIFIED THE DEF (JAMES G. BROWN) AS THE SUBJECT WHO DID THE SHOOTING. DET. DONAVAN ALSO CONDUCTED A PHOTOGRAPHIC LINEUP WITH THE TWO VICTIMS AND BOTH IDENTIFIED THE DEF AS THE ONE WHO HAD SHOT THEM.

THIS OFFICER WAS ADVISED THAT VI SALADIN

DEPARTMENT WILMINGTON P.D.

**CONTINUATION SHEET**

| 5 PAGE | 6 COMPLAINT NO. | 52 INVESTIGATING OFFICER |
|---|---|---|
| 4 of 4 | 30-97-12047 | DUCKETT / BOZEMAN |

FITZGERALD) HAD RECEIVED A GUNSHOT WOUND ABOVE THE LEFT EYE AND WAS TRANSPORTED TO CHRISTIANA HOSPITAL ER FOR TREATMENT. THIS OFFICER WAS ALSO ADVISED THAT V2 (YUSUF FITZGERALD) WAS SHOT IN THE RIGHT ARM DURING THE INCIDENT AND TRANSPORTED TO CHRISTIANA HOSPITAL ER FOR TREATMENT. SEE THE ORIGINAL REPORT UNDER SAME CASE NUMBER TO BE COMPLETED BY DETECTIVE DIVISION.

THE DEF WAS BOOKED AND PROCESSED ON THE ABOVE CHARGES AT CENTRAL. THE DEF WAS MIRANDIZED BY THIS OFFICER AND STATED HE UNDERSTOOD SAME. THE DEF INVOKED HIS RIGHTS AND REFUSED TO MAKE ANY STATEMENTS AT THIS TIME.

| 4 DEPARTMENT | SUPPLEMENT REPORT | 6 COMPLAINT NO. |
|---|---|---|
| Wilmington Police | | 30-17-126 |

| 5 PAGE 1 of 3 | 3 DATE-TIME THIS REPORT 17 MAY 97 1505 | 1. V □ S ☒ 7 NAME LAST - FIRST - MIDDLE (BUSINESS, FIRM NAME) BROWN, JAMES G | |
|---|---|---|---|
| 23 DATE - TIME OF ORIGINAL INCIDENT 17 MAY 97 1156 HRS | 12 ADDRESS 2402 LAMONTE ST  WILM. DE. | | 84 ARREST NO. |
| 29 4-P-14 SENT   DATE YES ☐  NO ☐ | SUP SENT YES ☐  NO ☐ | 47 ADDITIONAL STOLEN | 59 OFFENSE CHANGED FROM | 27 SUPPLEMENT CODE |
| 58 FOLLOW-UP ☐ ADD INFO ☒ | 44 RECOV. STOLEN DATE | 46 ADDITIONAL RECOVERED | 25 CORRECT OFFENSE ATTEMPT MURDER 1st | 26 U.C.R. CLASS |

NARRATIVE CODE: DO NOT REPEAT THE RESULTS OF THE PRELIMINARY INVESTIGATION. REPORT ALL ACTIONS TAKEN AND ALL DEVELOPMENTS IN THE CASE SINCE THE LAST REPORT. DESCRIBE AND RECORD THE VALUE OF RECOVERED PROPERTY. LIST THE NAME RECORD NUMBER AND DESCRIPTION OF PERSONS ARRESTED. EXPLAIN CLASSIFICATION CHANGE. CLEARLY SHOW THE DISPOSITION OF RECOVERED PROPERTY

THIS OFFICERS 13E (PTM GEARHART AND PTM BROCK) RESPONDED TO THE UNIT BLOCK OF E. 23RD ST. REFERENCE SHOTS FIRED. UPON OUR ARRIVAL THESE OFFICERS SPOKE WITH SEVERAL WITNESSES IN THE BLOCK AND LOCATED A CRIME SCENE IN FRONT OF # 34 E 23RD ST.

THIS OFFICER WAS APPROACHED BY (W-1) JEFF ADAMS WHO STATED THAT HE OBSERVED THE ENTIRE INCIDENT. (W-1) INDICATED THAT (S-1) "THE SHOOTER" BEGAN ARGUING WITH BOTH VICTIMS AND THEN BEGAN TO FIGHT IN THE UNIT BLOCK OF E. 23RD ST. IN FRONT OF # 34 E 23RD ST. (W-1) STATED THAT THE (S-1) FIRED APPROXIMATELY 4 SHOTS AND THEN RAN EAST BOUND ON E. 23RD ST. (W-1) WAS ADVISED TO STAND BY FOR DET. HARRIS FOR FURTHER QUESTIONING.

THIS OFFICER APPROACHED A BLACK FEMALE THAT LIVE AT # 36 E. 23RD ST., AT WHICH TIME SHE STATED SHE DID NOT WITNESS ANYTHING. THIS OFFICER ALSO APPROACHED SEVERAL OTHER INDIVIDUALS AT #'S 27 AND 29 E 23RD ST WITH NEGATIVE RESULTS.

THIS OFFICER WAS APPROACHED BY (W-2) MARY ELLEN BOE WHO WAS LEAVING # 30 E 23RD ST. (W-2) INDICATED THAT

| 52 REPORTING OFFICER PTLM. W. GEARHART  NO. 6975  DIV. | 53 STATUS ☐ UNFOUNDED  ☐ ARREST - JUV. ☐ PENDING - ACTIVE  ☐ PEND-INACTIVE ☒ ARREST - ADULT  ☐ SERVICE CLEAR | 54 EXCEPTIONAL CLEAR ☐ DEATH SUSPECT  ☐ NO V COOPERATION ☐ PROSECUTION DECLINED  ☐ JUV NO CUSTODY ☐ EXTRADITION DECLINED  ☐ ADMIN SANCTION | |
|---|---|---|---|
| 51 SUPERVISOR APPROVING PTLM. A. BROCK   6369 | | | |
| 56 SOLVABILITY FACTORS  ☐ WIT  ☐ M.O.  ☐ EVIDENCE  ☐ TRAC. STOLEN  ☐ SUSP VEH ID'ED ☐ SUSP NAMED  ☐ SUSP LOCATED  ☐ SUSP DESCRIBED  ☐ SUSP ID'ED | | | 57 ☐ OFFICE  ☐ FOLLOW-UP  ☒ CLOSE |

DXX. # 45-06-78/06/08 DSP-6013/8/85

⋆-25

CRIMINAL INVESTIGATION

DEPARTMENT ___W.P.D.___

**CONTINUATION SHEET**

| PAGE 2 OF 2 | COMPLAINT NO. 30-97-1204 | INVESTIGATING OFFICER PTLM. ENGHART 0875 |

SHE WAS A VISITING NURSE AND SHE HEARD APPROXIMATELY
2 OR 3 SHOTS. (W-2) INDICATED THAT SHE OBSERVED A BLACK
MALE WEARING A GRAY JACKET HOLDING ANOTHER BLACK MALE
WEARING AN ORANGE T-SHIRT IN A HEAD-LOCK. (W-2) STATED
THAT THE (S-1) PULLED OUT A GUN AND PLACED IT TO THE
VICTIMS HEAD. (W-2) INDICATED SHOTS WERE FIRED, AT WHICH
TIME A SECOND VICTIM STANDING NEAR THEM BEGAN WALKING
W/B ON E 23RD HOLDING HIS HEAD. THE SECOND VICTIM WAS
DESCRIBED AS A BLACK MALE WEARING A WHITE T-SHIRT WITH
NO SLEEVES, WHO EVENTUALLY CAME BACK DOWN THE STREET
AND STOOD AT 23RD AND LAMONTE WITH A CROWD OF PEOPLE.
(W-2) STATED THAT THE ALTERCATION OCCURRED NEXT TO
HER 1987 PLYM RELIANT PC17047, BLUE IN COLOR WHICH
WAS PARKED IN THE UNIT. BLK. OF E.23RD ST. (W-2) INDICATED
THAT A YOUNG BLACK MALE THAT RESIDES AT #30 E.23RD ST.
OBSERVED THE ENTIRE INCIDENT FROM HIS FRONT DOOR. THIS
INFORMATION WAS GIVEN TO DET. HARRIS.

PTLM. BROCK SPOKE WITH (V-2) YUSEF FITZGERALD THAT
APPROACHED HIM STATING HE HAD BEEN SHOT IN THE
RIGHT BICEP. (V-2) STATED THAT HE WAS STANDING IN THE
UNIT BLOCK OF E.23RD ST. AND OVER HEARD (S-1) AND (V-1)
ENGAGED IN A VERBAL ARGUMENT, AT WHICH TIME (S-1)
PULLED OUT A SMALL BLACK HAND-GUN AND BEGAN WAVING
IT TOWARDS (V-1). MOMENTS LATER AFTER (S-1) HAD PLACED
THE GUN BACK INTO HIS WAIST-BAND THE (S-1) AGAIN PULLED
OUT THE GUN AND BEGAN FIRING IT TOWARDS (V-1) AND (V-2).
(V-2) STATED THAT HE RAN S/B BETWEEN #34 AND #36
FOR COVER AND WAS STRUCK BY A BULLET IN THE ARM.

DEPARTMENT _W.P.D._

**CONTINUATION SHEET**

| 5 PAGE | 6 COMPLAINT NO. | 52 INVESTIGATING OFFICER |
|---|---|---|
| 3 OF 3 | 30-97-2047 | W. GEARHART  6975 |

(W-2) INDICATED THAT THE (S-1) RAN E/B ON E. 23RD ST.
WITH A GROUP OF PEOPLE CHASING HIM.

PTLM. BROCK SPOKE WITH (W-3) TARYRON CUSTIS WHO
STATED THAT HE WAS STANDING IN THE BLOCK WHEN HIS
BROTHERS (V-1) AND (V-2) WERE OBSERVED ARGUING WITH (S-1)
EAST OF HIS LOCATION. (W-3) DESCRIBED THE (S-1) AS
WEARING A DARK JACKET WITH YELLOW LINING, HEAVY SET, BM
WITH LIGHT COMPLEXION. (W-3) SAW (S-1) PULL OUT A GUN
AND WAIVED IT STATING " I DON'T GIVE A FUCK" ... 'ITS
GONNA BE WHAT EVER ITS GONNA BE!" HE BEGAN WAIVING IT
AT BOTH (V-1) AND (V-2) AND THEN FIRED 4 TO 5 SHOTS.
(S-1) BEGAN RUNNING E/B TO CARTER ST.

IT SHOULD BE KNOWN THAT THIS OFFICER LOCATED A
SMALL CLEAR PLASTIC BAG TIED IN A KNOT CONTAINING A CHUNKY TAN
SUBSTANCE. THIS OFFICER TAGGED SAME INTO RECORDS DIVISION AS
EVIDENCE. THE EVIDENCE WAS LOCATED IN THE UNIT BLK. OF E. 23RD ST.
DIRECTLY WHERE (W-1) AND (W-2) STATED THE SCENE WAS. THIS OFFICER
SPOKE WITH PTLM. DUCKET (ARRESTING OFFICER) WHO INDICATED THAT
THE DEF. HAD SIMILAR EVIDENCE IN HIS POSSESSION AT THE TIME
OF HIS ARREST.

W-1  ADAMS , JEFF  8-4-60  609 N. SCOTT ST.  (H) 373-8148
W-2  BOGEET, MARY ELLEN  422 S. BROOM ST.  (H) 654-5576
W-3  CUSTIS , TARTRON  9-26-79  44 MEEET RD. NEW CASTLE.  (H) 325-0761
V-1  UNKNOWN
V-2  FITZGERALD, YUSEF  7-15-77  #3 E. 23RD ST.  (H) 426-0591

27

1    gun, fighting off the guy who didn't have the gun,

2    shot his brother.

3           None of the stuff, to use that term, that

4    was thrown up on the wall behind you sticks, ladies

5    and gentlemen, because while you may want to doubt

6    Yusuf and Saladine because what they have to say

7    doesn't exactly coincide detail for detail, when you

8    hear from two disinterested parties, Jeffrey Adams,

9    who has nothing to gain by coming in here and

10   testifying against somebody from the neighborhood

11   where he spends time and from where he works, and

12   Maryellen Bogert, who doesn't know anybody in this

13   case from the man on the moon, both tell you that the

14   man in the gray jacket, the defendant, pointed the

15   gun at the guy standing a couple feet away from him

16   and shot him in the head.

17          Thank you.

18                    *  *  *  *  *

19

20

21

22

23

A - 26

Donovan-Cross                                    134

1    seemed to calm down.  He started back in the house.

2    At that time he heard gunshots.

3         Q    Did he at any time ever tell you that he

4    saw anyone get shot?

5         A    He did not see anyone get shot.  What he

6    stated was that he saw the subject sitting at the

7    defense table walking down the street after he heard

8    the shots with a gun in his hand.

9         Q    Was there any other investigation of the

10   crime scene, canvassing to see if anyone else on the

11   streets had weapons?

12        A    As far as stopping and searching people?

13        Q    Yes.

14        A    I don't believe so.

15        Q    The bullets that were -- are in evidence,

16   there was two spent and two unspent, correct?

17        A    That's correct.

18        Q    So there were no other bullets or casings

19   that came out of this gun, just the four items that

20   were recovered?

21        A    As far as I know.  I never actually saw

22   that gun or casings or projectiles until yesterday.

23        Q    Would you agree that if a round is fired

A-27

Donovan-Cross                    135

1    from a revolver, that a casing would remain, empty

2    casing would remain in the revolver?

3        A    It would remain in unless extracted by

4    whoever is handling the weapon.

5        Q    But it would be normal unless someone

6    extracted them that if there were six bullets fired,

7    there would be six empty casings?

8        A    That's correct.

9        Q    Were you ever able to determine whether the

10   bullet that is in Saladine and the bullet that was in

11   Yusuf was fired from that gun?

12       A    I don't have the projectiles.  No, I don't.

13            MR. FIGLIOLA:  Nothing further, your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. PEDERSEN:

16       Q    And in order to do that, Detective Donovan,

17   you would have to go inside of Saladine Fitzgerald's

18   head?

19       A    They would have to remove the bullet.

20       Q    Did you see the defendant at the police

21   station that afternoon?

22       A    Yes, I did.

23       Q    And did you see the jacket from which

A - 28

Burris-Cross

1    Q    How many people were wrestling with the

2  person with the gun?

3    A    How many people?

4    Q    Yeah.

5    A    I think -- it was only Yusuf and Saladine,

6  Yusuf and Saladine.

7    Q    Did you ever hear anyone say, I'm going to

8  shoot you or I'm going to kill you or anything of

9  that nature?

10    A    No, sir.

11         MR. FIGLIOLA:  I have nothing further, your

12  Honor.

13              REDIRECT EXAMINATION

14  BY MR. PEDERSEN:

15    Q    At this point, when your brother was shot

16  and you said that he and Yusuf and the person with

17  the gun were sort of tangling, and you said Saladine

18  was trying to keep Yusuf from the guy with the gun,

19  how far away were you from those three people when

20  the gun went off?

21    A    Probably about a couple feet.  I was like

22  -- when the gun finally went off, I was only like a

23  couple feet.

A-29

Burris-Redirect                                    72

1    this gunman?

2            THE WITNESS:  When we get down the street,

3    I guess the gunman --

4            THE COURT:  Can you see this or are you

5    guessing?

6            THE WITNESS:  I can see this, but what I'm

7    saying, I am thinking that he was probably thinking

8    in his mind --

9            THE COURT:  No, just tell me what you saw.

10           THE WITNESS:  I seen the whole thing.  But

11   I figured that he was probably sleeping in his head,

12   wasn't paying attention, so they probably seen that

13   he wasn't really paying attention to them, took his

14   eyes off of them, so they was trying to get the gun.

15   Like he hesitated on looking at them.  He wasn't

16   paying attention.

17           THE COURT:  So eventually, Yusuf and

18   Saladine and the gentleman struggled with the gun,

19   right?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  And the gun goes off?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  And that is when your brother

A-30

Y. Fitzgerald-Direct                     30

1    street grabbed you?

2        A    Tried to, anyway.

3        Q    Where on your body did he grab you?

4        A    Up here somewhere.

5        Q    When he did that, did you see whether or

6    not he had anything in his hand?

7        A    I wasn't sure at the time if he had

8    something, but I heard it.

9        Q    You heard it?

10       A    Yeah, as we was tussling.

11       Q    What did you hear?

12       A    The shot.

13       Q    What happened when the person grabbed you

14   around your shirt or on your shirt like that?  Then

15   what happened?

16       A    I was trying to get him, move his hand.

17   That's when I heard the shot.  When I heard the shot,

18   I was trying to get loose then and run.  When I ran,

19   I looked back when I got to the alleyway to see what

20   was wrong with my brother.  I seen my brother going

21   to the car and I seen him backing up.  He just lit

22   off four more shots at me, and he just started

23   backing up, walking with the gun.

A-31

1    nervous.  I'm just the judge.  That's okay.  Can we

2    identify fight, what that means.  I'm not quite sure

3    -- maybe Mr. Figliola can help.  I'm not sure you're

4    meaning from the very beginning of the incident you

5    see to the very end, or were they struggling for 15

6    minutes before you heard a shot?

7              THE WITNESS:  They were struggling.

8              THE COURT:  So you believe they were

9    struggling for about 10 or 15 minutes before any shot

10   was heard?

11             THE WITNESS:  Yes.  They were struggling

12   first, and then during the struggling, then I heard

13   the shot.

14             THE COURT:  But from the time you first

15   started observing them until the time you hear the

16   shot, was that 10 or 15 minutes or was it shorter?

17             THE WITNESS:  It was probably shorter, say

18   five to 10.

19             THE COURT:  And you're watching it for the

20   five or 10 minutes, the whole time?

21             THE WITNESS:  Yes.

22             THE COURT:  Thank you.

23             I'm sorry, Mr. Figliola.  I wasn't quite

A-32

3-3-99

28

1   Figliola.

2          MR. FIGLIOLA:  Thank you, your Honor.  It's

3   now afternoon, so good afternoon.  Judge Carpenter

4   previously introduced myself.  I'm Anthony Figliola,

5   and I am representing James Brown, the defendant

6   seated to the -- seated at the table behind me.

7          In a criminal case it's customary, the

8   Judge indicates to everyone that a defendant is

9   innocent until proven guilty.  The State gets up here

10  and says, well, he's innocent until proven guilty,

11  and then they read you an indictment and put in front

12  of you their case.  And in essence, they're telling

13  you, this is the way it happened, and therefore,

14  there should be no question as to whether the person

15  is innocent or guilty.  Well, that decision is not

16  supposed to be made until the end of the case, when

17  you have heard all the evidence, when you have heard

18  the Judge's instructions.  It's easy for the State to

19  get up here and tell you a story.  Well, what's not

20  always so easy is for their witnesses to tell the

21  same story.  And that's your job, to determine

22  whether in fact those witnesses tell the same story.

23          There's two issues to this case.  One, did

A-33

3-31-98

29

1    the police arrest the right man; and two, if the

2    right man was arrested, was he properly charged.  I'm

3    going to talk a little bit about the second issue

4    because I think the first issue is pretty evident.

5    You either have the right man or you don't.  And the

6    State is going to go through their proof to show you

7    that they do have the right man, and then you will

8    have to decide.

9          But, for example, attempted murder first

10   degree, which is the lead charge here, Mr. Pedersen

11   indicated that the man was shot in the face, and

12   because he's shot in the face, which is vulnerable,

13   he obviously was attempting to kill someone.

14   However, he also said something else in his opening

15   remarks that is probably even more relevant.  He

16   indicated that just because the person that fired the

17   bullet, because that bullet did not take the path it

18   was intended to take does not mean that it was not

19   attempted murder.  That also means that if you are in

20   a struggle and you pull a trigger and you're aiming

21   at someone's knee or their arm or their side and it

22   strikes them in the face, that does not mean just

23   because the person was struck in the face that it was

A-34

1    There are certain things in the case, however, that

2    are easy.

3        Mr. Brown got up on the stand.  He admitted

4    he had drugs.  And we admitted that there was more

5    than five grams of cocaine.  The trafficking charge

6    is there before you.  It's not going to be denied.

7        He resisted arrest.  That is not in

8    dispute.

9        Then we have the possession with intent to

10    deliver.  The State basically is making their

11    argument that because of the way -- the amount of the

12    drugs that he had on him and the way it was packaged,

13    it's clear that he intended to sell the drugs.  They

14    have offered no proof that he was selling drugs that

15    day.  There has been no proof or any testimony that

16    he ever sold drugs.

17        There's testimony that he is a user.  The

18    State says, well, he's a user.  Therefore, he

19    wouldn't buy drugs packaged the way they were

20    packaged.  Well, we would argue that if you're a

21    user, you're going to buy drugs any way you can get

22    the drugs.  And as far as what he says he paid for

23    them, if in fact he was offered a deal and he could

A- 35

1    instructions that I will give you as to the law

2    that's applicable to this case.  The evidence in

3    which you will find the facts are the testimony of

4    witnesses that would appear before you, the exhibits

5    that are introduced through their testimony, and any

6    other facts that are stipulated to by the parties.

7            Now, before proceeding further, let me kind

8    of introduce the parties who are in the courtroom.

9    The State is represented by Mr. Pedersen, who is

10   seated at the counsel table closest to you.  Seated

11   with him is his chief investigating officer who will

12   assist him in this matter.  Mr. Figliola is the

13   counsel for Mr. Brown, who is seated at the counsel

14   table furthest from you, and Mr. Brown is seated next

15   to him.  The individual who called your name out in

16   the beginning is the court clerk.  He will also be

17   the individual who will swear the witnesses who

18   appear before you.  He will also be the caretaker of

19   any evidence that is introduced and the marking of

20   that evidence.  Obviously, the person right in front

21   of you is the court reporter taking down the

22   proceedings.  The person who has been helping you

23   here is the bailiff.  He will be the main contact

3-31-98

23

1    that when all of the argument is said and done, the

2    question that you are going to be asked to answer is

3    did the defendant intend to kill Saladine Fitzgerald

4    when he shot him that night in May of 1997.  And I

5    submit to you that if your intention, ladies and

6    gentlemen, is to kill someone, there is no surer

7    place to aim and to shoot than between the eyes,

8    right between the eyes.

9            Ladies and gentlemen, let me stop and

10   introduce myself for a moment.  My name is Tom

11   Pedersen, and I know Judge Carpenter already

12   introduced me to you, and I'm the prosecutor assigned

13   to present this case to you.  Sitting at the table

14   with me is Detective Bob Donovan, and he is a

15   detective with the Wilmington Police Department.  And

16   together, we will send this case to you.  And what I

17   will do is present the witnesses and the

18   investigation as Detective Donovan was able to gather

19   them on that night in May of 1997.

20           And you are going to hear not only from

21   Saladine and Yusuf Fitzgerald, who were both shot

22   that night, but you will also hear from some of the

23   witnesses who were able to observe the actions that

A - 37

1            Do you have another witness?

2            MR. PEDERSEN:  Yes, your Honor.  Detective

3    Donovan.

4            ROBERT DONOVAN, called on the part and

5    behalf of the State, being first duly sworn according

6    to law, was examined and testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. PEDERSEN:

9        Q    Detective, you work for the Wilmington

10   Police Department?

11       A    That's correct.

12       Q    And how long have you worked there?

13       A    10 years.

14       Q    And how long have you been a detective?

15       A    Three years.

16       Q    What does it mean or what are your duties

17   in being a detective?

18       A    We're assigned the majority of the felony

19   investigations in the city.

20       Q    And how do you come to be assigned to a

21   particular case?

22       A    I believe this particular case I was

23   assigned -- I was working the weekend.  I was on call

A - 38

1          MR. PEDERSEN:  Thank you, your Honor.  The

2    State recalls Detective Donovan.

3               STATE'S REBUTTAL EVIDENCE

4          THE COURT:  Detective, you are still under

5    oath, sir.

6          ROBERT DONOVAN, recalled on the part and

7    behalf of the State, being previously duly sworn

8    according to law, was examined and testified as

9    follows:

10              DIRECT EXAMINATION

11   BY MR. PEDERSEN:

12     Q    Detective, have you had the opportunity to

13   observe Mr. Brown's testimony just now?

14     A    That's correct.

15     Q    Have you had the opportunity to listen to

16   the manner in which he described the lineup between

17   Saladine Fitzgerald and the proximity he was to Mr.

18   Brown when he was shot?

19     A    That's correct.

20     Q    When you came in contact with Mr. Brown at

21   the police station, did he have on a jacket that I

22   think we talked about this morning, dark in color,

23   black or red?

A-39

Bozeman-Direct

1    approximately 40 people standing on the corners,

2    pointing northbound on Carter Street, and were

3    shouting various things, there he goes and that's

4    him.

5        Q    Did you see somebody that fit the

6    description?

7        A    We responded to the 2300 block of Carter,

8    and we spotted an individual that fit the

9    description.  It was a black male wearing a gray

10    jacket.  He had both of his hands in his jacket

11    pockets.

12        Q    Now, knowing what you had heard with your

13    own ears and what you had heard over the 911 center

14    and seeing someone matching the description with

15    their hands in their pockets, did that cause you and

16    your partner some concern?

17        A    Yes, it did.

18        Q    Did you attempt to speak, stop and speak

19    with the individual who was -- who fit that

20    description?

21        A    We conducted a felony pedestrian stop, had

22    our departmental weapons drawn and trained at the

23    subject, and my partner, Officer Duckett, was

A - 40

1        A     That's correct.

2        Q     Did you have the chance to observe that?

3        A     Yes, I did.

4        Q     Did it have any blood on it?

5        A     No, it did not.

6        Q     We have talked this morning also about a

7    lineup that you showed to some witnesses.

8        A     Yes, that's correct.

9        Q     The picture that you used as number two

10   here, which is Mr. Brown --

11       A     Yes.

12       Q     -- can you tell me when you took that

13   picture?

14       A     I took that picture May 17th, 1997.

15       Q     And that was the day you first encountered

16   Mr. Brown?

17       A     That's correct.

18       Q     And in that picture he's wearing a white

19   T-shirt.  Is that correct?

20       A     That's correct, white or light gray.

21       Q     Is there any blood on that T-shirt?

22       A     No, there is not.

23       Q     Is there any blood that you can recall that

A-41

2

| | |
|---|---|
| 1 | March 31, 1998 |
| | 10:35 o'clock a.m. |
| 2 | Courtroom No. 201 |

3    PRESENT:

4            As noted.

5            (A jury was duly impaneled.)

6            THE COURT:  Ladies and gentlemen, we're

7    going to first swear you as a jury, and then we're

8    going to take a short break so that the bailiff can

9    show you the juryroom behind the courtroom and so I

10    can discuss with the attorneys a little bit about the

11    case and scheduling ideas so we can give you a better

12    idea of what we expect the week to be.  Once we take

13    that short break, we'll come back and we'll begin

14    with the opening statements of the attorneys.  We'll

15    give them, and then we will begin the presentation of

16    the evidence to you.  But first we need to swear you

17    as prospective jurors.  So I am going to ask you to

18    stand.  When you hear your name called, please either

19    grab the Bible, and we'll ask you to share them in

20    groups of four, or raise your right hand if you

21    prefer to affirm.

22            (The jury was duly sworn.)

23            THE COURT:  Ladies and gentlemen, again,

A - 42

Adams-Direct                                    68

1        A    His hands were free.  You could see his

2    hands.

3        Q    At that time did you know the other fellow

4    had a gun?

5        A    Not at that time.  When -- we thought it

6    was a fair fight, and the gentleman just pulled out

7    the gun, shot him, ran down the street, dropped the

8    coat -- he had two coats on.  He dropped one coat in

9    front of him on the street, and he just started

10   busting off the rest of the rounds that was in the

11   gun.  And he ran one, two, three -- the fifth house

12   on 23rd, going the other way to a corner, to a porch

13   house, and he ran out the back door.  That's when I

14   jumped in my car and went around the corner and we

15   caught him in the alleyway.

16       Q    The person that was shot, did you see what

17   happened to him after he was shot?

18       A    No.  I think somebody rushed him to the

19   hospital.

20       Q    At that time did you know if anybody else

21   had been shot?

22       A    No.  We didn't know -- his brother Yusuf, I

23   said the first time, he was standing there.  The cat

A - 43

Adams-Direct                                    69

1    wanted to hit him with bottles because he shot his

2    brother.  He didn't know he was shot until somebody

3    told him he was shot.  He never knew he was shot at

4    all.

5        Q    So you didn't know he was shot at that

6    time?

7        A    He didn't know.  Nobody knew he was shot

8    either.

9        Q    Up to that time when you saw Yusuf --

10       A    Could I back up to something?  There was

11   another guy with him, too.  This is another gentleman

12   that was with him.  Everybody thought he shot the

13   other guy too, who was laying on the ground.  But the

14   guy said -- we thought he shot two people, but he

15   didn't shoot the other person, the other person that

16   fell when he pulled the gun out again and shot, right

17   there on 23rd right in the middle of the block.  We

18   thought he shot him too.  That was somebody else that

19   was running with him that day.  He had another

20   gentleman with him.

21       Q    So you --

22       A    When he ran, after he shot the other

23   gentleman, there's another guy with him, and when he

A-44

PAGE #6 OF 9
30-97-12047
DET. ROBERT DONOVAN I-6278


MARTELL BLACK; CONTINUED

BLACK ADVISED THAT HE DOES NOT KNOW THE SUBJECT BUT STATED
THAT HE COULD IDENTIFY HIM. AT THIS TIME BLACK WAS SHOWN THE
WILMINGTON POLICE PHOTOGRAPHIC LINEUP, BLACK POSITIVELY IDENTIFIED
PHOTOGRAPH #2 (JAMES BROWN).

WITNESS #6: KEVIN BRITT, BLACK MALE 7/1/64, 310 W 22ND
STREET WILMINGTON, DE H-655-3464

AT APPROXIMATELY 1230 HOURS DETECTIVE SERGEANT CHRISTINE
DUNNING SPOKE WITH KEVIN BRITT IN THE DETECTIVE DIVISION, THE
INTERVIEW WAS RECORDED. BRITT ADVISED THAT HE WAS IN THE UNIT BLOCK
E 23RD STREET DRINKING BEER WITH SOME FRIENDS, BIGGIE AND E-MAN. HE
ADVISED THAT BIGGIE AND E-MAN GOT INTO AN ARGUMENT. BRITT ADVISED
THAT HE ATTEMPTED TO BREAK UP THE FIGHT.
BRITT ADVISED THAT IT COULD OF BEEN OVER DRUGS BUT HE IS NOT
SURE. HE ADVISED THAT HE DID NOT KNOW WHO PULLED OUT THE GUN FIRST.
BRITT ADVISED THAT HE HAD NO ADDITIONAL INFORMATION REGARDING THIS
INCIDENT. FOR FURTHER INFORMATION SEE TRANSCRIBED STATEMENT.


SUSPECT INFORMATION:

SUSPECT #1: JAMES GUY BROWN, BLACK MALE 12/1/59, 6'00" 220
LBS, 2402 LAMOTTE STREET WILMINGTON, DE


SUSPECT INTERVIEW:

ON 17 MAY 97, AT APPROXIMATELY 1315 HOURS THIS INVESTIGATOR
SPOKE WITH JAMES BROWN. HE ADVISED THAT HE WANTED AN ATTORNEY AND
WAS NOT GOING TO TALK WITHOUT ONE.


ARREST ACTION:

ON 17 MAY 97, JAMES BROWN WAS ARRESTED AND BOOKED FOR TWO
COUNTS ATTEMPTED MURDER 1ST, TWO COUNTS POSSESSION OF A FIREARM
DURING THE COMMISSION OF A FELONY, ONE COUNT CARRYING A CONCEALED
DEADLY WEAPON, ONE COUNT TRAFFICKING COCAINE, ONE COUNT POSSESSION
WITH INTENT TO DELIVER COCAINE, AND ONE COUNT OF RESISTING ARREST.

A-45

Brown-Direct                    149

1       A    No, sir.

2       Q    So you are disabled?

3       A    Yes, sir.

4       Q    What effect does that have on you

5   physically?

6       A    I have to walk with a walking cane, and I

7   have a hernia, and I be very fearful a lot of times

8   when I'm out in the public.

9       Q    Now, let's talk about May the 18th, 1997.

10  Were you on the corner of 23rd and Lamotte that day?

11      A    No, sir.  It was May 17th.

12      Q    I'm sorry.  And were you on the corner of

13  23rd and Lamotte on that day?

14      A    Yes, sir.

15      Q    Who were you there with?

16      A    I was there by myself, but I was -- I have

17  to tell the truth about it.  I was there purchasing

18  some drugs so I could get high.

19      Q    Had you made your purchase of drugs?

20      A    Yes, I did.

21      Q    And do you know -- did you know prior to

22  that date Saladine Fitzgerald?

23      A    Yes, I did.

A-46

Brown-Direct                    151

1    where did it -- how long did it go on?

2        A    It went on for about maybe a good 10

3    minutes.

4        Q    Okay.

5        A    But he had left because he said he was

6    going to get his brother because I owed his brother

7    some money.  And he had seen me buy -- buy 41 bags of

8    cocaine from this guy, so he went and got his

9    brother, and when his brother came back, they was

10   arguing with me about the money that I owed them,

11   that I had owed Yusuf.

12       Q    Now, at any point in time did you go behind

13   some bushes and get something?

14       A    No, sir.

15       Q    Now, did you walk up the street behind

16   Saladine as he was going to his brother's house?

17       A    No, sir.

18       Q    Where did you go?

19       A    I just stayed there, trying to -- they was

20   trying to get the rest -- I had a lot of money on me.

21   They knew I had the money and they was trying to get

22   the money from me because I owed his brother like a

23   hundred and something dollars.  So they was arguing

A - 47

Brown-Direct                              152

1    with me about the money and I wanted to go get high

2    because I smoke cocaine.  So they was trying to hold

3    me there, but I wanted to go get high.  So they left

4    and came back down the street because there was some

5    cops up the street parked.  They was doing something

6    up the street.  I didn't want to walk up that way

7    because I thought I might get arrested because I had

8    the cocaine on me.

9         Q    Now, was there any -- ever any physical

10   altercation between you and Saladine?

11        A    Yes, when he came back.

12        Q    And what about you and his brother?

13        A    Yes, when he came back.

14        Q    When they came back?  So nothing happened

15   before they walked up to the house?

16        A    No.

17        Q    Now, did either one of the brothers ever

18   come after you?

19        A    Yes, Saladine came after me first.

20        Q    And what happened when Saladine came after

21   you?

22        A    He punched me and we started fighting.

23   Then Yusuf tried to jump in it, and the next thing I

A-48

Brown-Direct                                    153

1    know, I seen a gun in my face.

2          Q     Do you know where the gun came from?

3          A     It was in Yusuf's hand.

4          Q     And did you try to get the gun away from

5    Yusuf?

6          A     Yes, I did.

7          Q     At some point in time did the gun go off?

8          A     Yes, it did.

9          Q     Do you know what happened when the gun went

10   off?

11         A     All I know is a lot of people started

12   scrambling out of the way because it was kind of a

13   big crowd there.

14         Q     How many shots did you hear?

15         A     I heard two shots.

16         Q     Did you see any blood anywhere?  Did you

17   see anybody bleeding?

18         A     I seen his brother fell.  His brother tried

19   to jump on my back while I was struggling with him

20   with the gun.

21         Q     And his brother fell and what did Yusuf do?

22         A     He just kept struggling with the gun, and

23   we was twisting and turning, and the gun popped him

A - 49

Brown-Direct                                            154

1   in his arm.

2        Q     How did you get the gun?

3        A     When I was struggling with him with the

4   gun, his other brother, the tallest one -- I think

5   his name is Taryron or something, Taryron Curtis.  I

6   can't pronounce his name -- he said, the cops is

7   coming, let the gun go, let the gun go, so he let the

8   gun go and I ran down the street with the gun.

9        Q     What did you do with the gun?

10       A     Put it in my coat pocket.

11       Q     Did you ever shoot the gun?

12       A     No, sir.

13       Q     Now, where did you go after you started

14  running?

15       A     I ran in the alley and smoked some coke.

16       Q     How long were you there?

17       A     About 10 minutes.

18       Q     When did you first see the police?

19       A     When I was coming out the alley.

20       Q     Do you remember how many police officers

21  there were?

22       A     First I didn't see the police.  I seen the

23  big guy.

A-50

IN THE SUPREME COURT OF THE STATE OF DELAWARE

031 , 2003

PRO SE                           JAMES G. BROWN a/k/a EDWARD X.
(DCC - #00350587)                WILLIAMS,
                                   Defendant Below,
(DCC - #00350587)                  Appellant,
                                 v.

E. R. MCFARLAN                   STATE OF DELAWARE,
                                   Plaintiff Below,
                                   Appellee.
                                 (CONSOLIDATED WITH NO. 57, 2003)

 DF $ 00.00

 2003

1    Jan  23    Notice of appeal from the order dated 8/1/02 reissued
                on 1/13/03, in the Superior Court, in and for New
                Castle County, by Judge Carpenter, in Cr.ID No.
                9705011656, with no designation of transcript.
                (served by mail 1/10/03) (eas)

2    Jan  29    Brief schedule issued. (opening brief due 3/17/03)
                (eas)

3    Jan  29    Letter dated 1/29/03 from Senior Court Clerk to
                Prothonotary, record is due to be filed by 2/21/03.
                (eas)

4    Feb  10    Appellant's appendix captioned in Superior Court
                (eas)

5    Feb  11    Letter dated 2/11/03 from Senior Court Clerk to
                appellant, directing him to advise this Court if he
                wishes this document to accompany his opening brief
                when filed (eas).

6    Feb  20    Order dated 2/20/03 by Holland, J., appeal Nos.
                31, 2003 and 57, 2003 are CONSOLIDATED.  The
                appellant's opening brief and appendix are due 3/24/03.
                (eas)

7    Feb  21    Letter dated 2/21/03 from Assistant Clerk to Loren C.
                Meyers, Esq., requesting a response by 3/3/03 to the
                appellant's Motion for Remand filed 2/5/03 in No. 57,
                2003 (afb).

8    Mar  06    Motion to proceed in forma pauperis by appellant.
                (no service shown-copy sent) (eas)

9    Mar  06    Order dated 3/6/03 by Clerk, appellant's motion to
                proceed in forma pauperis is GRANTED, limited only to
                waiver of docketing fee. (eas)

10   Mar  07    Record as ordered. (mfm)

| 11 | Mar 10 | Letter dated 5/14/02 received on 3/10/03 from Linda Jablonski to Clerk, requesting an extension to file the transcript. (eas) |
|----|--------|---|
| 12 | Mar 21 | State's answer to motion to remand. (served by mail 03/21/03) (mfm) |
| 13 | Mar 24 | Appellant's opening brief and appendix. (served by mail 3/20/03) (eas) |
| 14 | Mar 24 | Letter dated 3/20/03 from James Brown to Clerk, requesting a copy of the Appendix captioned in Superior Court filed on 2/10/03 and advising that it should not accompany the opening brief and appendix filed on 3/24/03. (copy sent) (eas) |
| 15 | Mar 24 | Letter dated 3/20/03 from appellant to Clerk, enclosing the sentencing order to be attached to the opening brief. (eas) |
| 16 | Mar 31 | Order dated 3/31/03 by Holland, J., the appellant has not established good cause why a remand is necessary for the furtherance of this appeal. (eas) |
| 17 | Apr 17 | Motion under Rule 15(b) by appellee. (served by mail 4/17/03) (afb) |
| 18 | Apr 21 | Order dated 4/21/03 by Steele, J., appellee's answering brief and appendix are due 4/25/03. (eas) |
| 19 | Apr 25 | State's answering brief. (served by mail 04/25/03) (mfm) |
| 20 | May 07 | Appellant's reply brief. (no service shown-copy sent) (eas) |
| 21 | May 13 | Notice dated 5-13-03 from Clerk to parties, the case will be submitted for decision on briefs as of 5-16-03. (clh) |
| 22 | Jun 24 | Order dated 6/24/03, Veasey, C.J., AFFIRMED. (ENV,RJH, MTS) (dlc) |
| 23 | Jun 30 | Letter dated 6/25/03 from appellant to Clerk, requesting copies of documents from the file and record. (eas) (sent 7/3/03) |
| 24 | Jul 02 | Letter dated 6/29/03 from appellant to Clerk, requesting documents in the file and record. (eas) (sent 7/3/03) |
| 25 | Jul 11 | Record and mandate to clerk of court below. Case Closed (clh) |
| 26 | Jul 25 | Prothonotary's receipt of record and mandate on 7/17/03 (afb). |
| 27 | Aug 05 | Letter dated 8/1/03 from appellant to Clerk, requesting |

A-51

CERTIFICATE OF SERVICE

I, JAMES BROWN AKA EDWARD X. Williams SBI#350587 certify serving Upon the OFFICE of The Clerk For The U.S. District COURT OF Delaware one original Petition 28§2254 with forma pauperis Certificate and two Copies of Petition 28§2254 and three - Copies of Appendix to assist evidence in Petition.

On this 13, day of June 2005 will be placed in D.C.C. c/o hand to be mailed out in two large legal mail envelopes.

Address to:

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT OF DELAWARE
844 N. KING St. Lockbox 18
Wilm. Delaware 19801-3570

From: JAMES BROWN AKA EDWARD X Williams
SBI# 350587
D.C.C. MHU Bldg# 21 -B-L-2
SMYRNA, DE, 19977

James Brown aka Edward X Williams 6/13/05

(Hand Copy Kept by Petitioner)

For Postage
Pay to Attached

'' LEGAL MAIL ''

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
844 N. KING ST. Lockbox 18
Wilmington, Delaware
19801-3510



JAMES BROWN AKA
I/M EDWARD X. Williams
SBI# 350587   UNIT#21MHU B-L-2
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977